| | |
|---|---|
| ROBERT W. DIEHL, JR., and | : |
| MELANIE L. DIEHL, | :CIVIL ACTION NO. 3:19-CV-1303 |
| | :(JUDGE MARIANI) |
| Plaintiffs, | : |
| | : |
| v. | : |
| | : |
| SWN PRODUCTION COMPANY, LLC, | : |
| | : |
| Defendant. | : |
| | : |

## MEMORANDUM OPINION
## I. INTRODUCTION

Here the Court considers Defendant SWN Production Company, LLC's Motion to

Dismiss the Amended Complaint (Doc. 9). The above-captioned matter is a diversity action

brought by Robert W. Diehl, Jr., and Melanie Diehl ("Plaintiffs") against SWN Production

Company, LLC ("SWN" "Defendant") regarding an oil and gas lease between the parties.

As set out in the Amended Complaint (Doc. 8), Plaintiffs assert three counts based on

"Breach of Contract – Implied Covenant to Market Hydrocarbons" (Counts I-III), a count for

"Breach of Contract – Implied Covenant to Develop Hydrocarbons" (Count IV), a count for

"Declaratory Relief" (Count V), and a count for "Quiet Title" (Count VI). (Doc. 8 at 7-21.)

With the pending motion, Defendant seeks dismissal of the entire Amended Complaint with

prejudice pursuant to Federal Rule of Civil Procedure 12(b)(6). (Doc. 9 at 1; Doc. 9-2 at 1.)

For the reasons that follow, the Court will deny Defendant's motion in part and grant it in part.

## II. BACKGROUND

Plaintiffs own approximately 160.94 acres in Oakland Township, Susquehanna County, Pennsylvania ("Subject Property") which was leased to Cabot Oil & Gas Corporation ("Cabot") on October 25, 2007.  (Doc. 8 ¶¶ 3-4.)  The Lease was assigned from Cabot to Southwestern Energy Production Company ("Southwestern") on November 17, 2011.  (Doc. 8 ¶ 6.)  Southwestern converted to SWN and is the sole lessee and working interest holder in the Lease.  (Doc. 8 ¶¶ 8-9.)

The Lease had a primary term of five years, with an option to extend for five additional years by paying $100.00 per acre, and remains in force "as long thereafter as oil or gas is produced, or considered produced under the terms of this lease, in paying quantities from the premises or from land pooled therewith[.]"[1]  (Doc. 8-1, Am. Compl., Ex.

---

[1] This is known as the "habendum clause" of a lease which, in this case, states:

> This lease shall remain in force for a term of fine (5) years from this date (called "primary term") and as long thereafter as oil or gas is produced, or considered produced under the terms of the lease, in paying quantities from the premises or from lands pooled therewith or the premises are used for storage purposes as provided in paragraph 6 hereof, or this lease is maintained in force under any subsequent provisions hereof.

(Doc. 8-1 ¶ 2.)

A, ¶¶ 2, 13.)  Should production occur, SPC must pay Plaintiffs royalties based on the "amount realized from the sale of the gas at the well," and SPC is expressly permitted to deduct post-production expenses incurred downstream from the wellhead.[2]  (*Id.* ¶ 3.)  In addition to actual production, oil or gas is "considered produced" if the lessee pays a "shut-in royalty" of $1.00/acre/year.  (*Id.* ¶ 4.)  Further, should lessee fail to make a required payment, the Lease does not terminate; the lessor simply is entitled to a "correcting payment or tender with interest at the rate of eight (8%) annum[.]"  (*Id.*)

On September 11, 2012, Southwestern exercised its option to extend the Lease. (Doc. 8 ¶ 7.)  Accordingly, the Lease's primary term ended on October 25, 2017.  (Doc. 8-3.) Portions of the Subject Property were placed into the Walker Diehl North Gas Unit and the Walker Diehl South Gas Unit (collectively, the "Units").  (Docs. 8-4, 8-5.)  The Units

---

[2] The royalty clause reads as follows:

> Lessee shall deliver to the credit of Lessor, free of cost, into Lessor's tanks on the premises or in the pipeline thereon which Lessor may designate, the equal one-eighth (1/8 ) part of all oil or liquid hydrocarbons produced and saved from the premises, and shall pay the Lessor on gas, including casinghead gas or other gaseous substances, produced and sold from the premises one-eighth (1/8 ) of the amount realized from the sale of gas at the well (meaning the amount realized less all costs of gathering, transportation, compression, fuel, line loss and other post-production expenses incurred downstream of the wellhead). Payment for royalties in accordance herewith shall constitute full compensation for the gas and all of its components. No royalty shall be due on stored gas produced from the premises or on gas produced from a storage formation or formations hereunder.

(Doc. 8-1 ¶ 3.)

encompass 1,376.097 acres and each unit has one operational well producing natural gas from the Marcellus Shale formation. (Doc. 8 ¶¶ 13-15.)

Plaintiffs' factual recitation also contains the following averments:

> SWN sells gas from the Units where it enters interstate pipelines and not at the wellhead. [ECF Doc. 8-6]. The prices SWN receives have been less than published index prices on the leg of the Tennessee Gas Pipeline which is believed to traverse through Susquehanna County - the location of the nearest interstate pipeline to the Subject Property. [ECF Doc. 8 at ¶ 32]. It is believed that SWN sells to an affiliate at the interstate pipeline rather than attempt to market the gas itself to other buyers for greater value. [ECF Doc. 8 at ¶ 54]. In addition to depressed pricing, the Diehls' royalties are significantly reduced by deductions taken by SWN. [ECF Doc. 8-8]. Given the low prices and high costs, it is averred that the Lease is not producing hydrocarbons in paying quantities. [ECF Doc. 8 at ¶ 98].

(Doc. 13 at 8.)

## III. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the

elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (internal citations, alterations, and quotations marks omitted). A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Labs.*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citation, alteration, and quotation marks omitted). Thus, "the presumption of truth attaches only to those allegations for which there is sufficient 'factual matter' to render them 'plausible on [their] face.'" *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (alteration in original) (quoting *Iqbal*, 556 U.S. at 679). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.*

"Although the plausibility standard 'does not impose a probability requirement,' it does require a pleading to show 'more than a sheer possibility that a defendant has acted unlawfully.'" *Connelly v. Lane Constr. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal citation omitted) (first quoting *Twombly*, 550 U.S. at 556; then quoting *Iqbal,* 556 U.S. at 678). "The plausibility determination is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 786-87 (quoting *Iqbal*, 556 U.S. 679).

The Third Circuit Court of Appeals has identified the following three-step inquiry as appropriate to determine the sufficiency of a complaint pursuant to *Twombly* and *Iqbal:*

First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 221 (3d Cir.2011); *see also Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013); *Santiago v. Warminster Twp.*, 629 F.3d 121, 130 (3d Cir.2010).

Even "if a complaint is subject to Rule 12(b)(6) dismissal, a district court must permit a curative amendment unless such an amendment would be inequitable or futile." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 245 (3d Cir. 2008).

[E]ven when plaintiff does not seek leave to amend his complaint after a defendant moves to dismiss it, unless the district court finds that amendment would be inequitable or futile, the court must inform the plaintiff that he or she has leave to amend the complaint within a set period of time.

*Id.*

## IV. ANALYSIS

Defendant asserts that the Court should dismiss all counts contained in Plaintiffs' Amended Complaint (Doc. 8) because Plaintiffs have failed to state a claim as a matter of law on their four breach of contract claims based on the implied covenant to market and implied covenant to reasonably develop (Counts I-IV) and Counts V and VI are derivative of the breach of contract claims. (Doc. 9 ¶¶ 13-15.) As discussed below, Plaintiffs maintain that each claim is sufficiently supported and Counts V and VI are not derivative of the breach of contract claims.

## A. Implied Covenant to Market

Defendant contends that Plaintiffs' implied duty to market claims fail both because they lack factual support and because Plaintiffs are attempting to substitute their business judgment for that of SWN.[3] (Doc. 11 at 17.) Plaintiffs respond that they have pled substantial facts to support their claims in Counts I, II, and III. (Doc. 13 at 18.) The Court concludes that Defendant has not satisfied its burden of showing that Plaintiffs have not pled sufficient facts to satisfy the plausibility standard as applied to their implied duty to market claims.

As a threshold matter, Defendant does not concede that an implied duty to market exists under Pennsylvania law. (Doc. 11 at 17 n.5.) However, Defendant states that it will not dispute the existence of the duty here. (*Id.*) Rather, Defendant notes that "[a]lthough the Pennsylvania Supreme Court has not recognized an implied duty to market, federal courts in Pennsylvania have identified such a duty." (*Id.* at 17-18 (citing *Chambers v. Chesapeake Appalachia, LLC*, 359 F.Supp.3d 268, 279 (M.D. Pa. 2019)).) *Chambers* stated the following:

> Pennsylvania recognizes [an "implied duty to market,"] which requires a lessee operating under a proceeds lease "to market the gas found 'but only at a reasonable profit[,]' taking into consideration 'the distance to market, the expense of marketing, and everything of that kind.'"[4] *Canfield* [*v. Santoil USA Onshore Props.*, Civ. A. No. 3:16-CV-85,] 2017 WL 1078184, at *22 [M.D. Pa.

---

[3] The words "covenant" and "duty" are used interchangeably when discussing this issue.

[4] A "proceeds" lease pays royalties based on the proceeds received for sale of the gas. *Canfield v. Statoil USA Onshore Props.*, Civ. A. No. 3:16-CV-85, 2017 WL 1078184, at *17 (M.D. Pa. Mar. 22, 2017). The Lease at issue in this case is a proceeds lease. (Doc. 8-1 ¶ 3.)

Mar. 22, 2017] (quoting *Iams v. Carnegie Nat. Gas Co.*, 194 Pa. 72, 45 A. 54, 54 (1899)). Texas imposes a similar duty on lessees. *See, e.g., Union Pac. Res. Grp., Inc. v. Hankins*, 111 S.W.3d 69, 72 (Tex. 2003) ("[A] lessee under a proceeds lease has 'an obligation to obtain the best current price reasonably available[.]' " (quotation omitted)). The essence of the duty to market is that the lessee must exercise its business judgment in good faith, acting as a reasonably prudent operator would. *See Canfield*, 2017 WL 1078184, at *23-24 (predicting the good faith judgment standard applicable to habendum clauses "would likely apply to the implied duty to market"). Thus "[u]nder some circumstances, a reasonable marketer may sell gas for more or less than market value," *Hankins*, 111 S.W.3d at 74; however, "failure to sell at market value may be relevant evidence of a breach of the covenant to market in good faith," *Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 373-74 (Tex. 2001) (quotation omitted). *See, e.g., Anderson Living Trust v. WPX Energy Prod., LLC*, 312 F.R.D. 620, 653 (D.N.M. 2015) ("[C]ourts facing situations in which a lessee sells hydrocarbons in non-arm's length transactions typically conclude that the lessee did not behave as a reasonably prudent operator unless it sold the hydrocarbons for the highest obtainable price.").

*Chambers*, 359 F. Supp. 3d at 279.

Reliance on Texas law was explained in *Canfield*: though the Pennsylvania Supreme Court has not addressed the scope of the implied duty to market in any recent decisions, an adequate explanation of the implied duty to market can be found in Texas Supreme Court decisions, and Texas law, like Pennsylvania law, allows parties to calculate royalties based on a wellhead price. 2017 WL 1078184, at *24. *Canfield* then set out the following scope of the implied duty to market:

In *Yzaguirre v. KCS Resources, Inc.*, the Texas Supreme Court explained that "[t]he implied covenant to reasonably market oil and gas serves to protect a lessor from the lessee's self-dealing or negligence." *Yzaguirre v. KCS Res., Inc.*, 53 S.W.3d 368, 374 (Tex. 2001). Accordingly, where the lease is silent, the lessee has a duty to market the oil and gas reasonably. 53 S.W.3d at 373. Where the lease is a proceeds lease, this obligation includes an "obligation to obtain the best current price reasonably available." *Union Pacific Res. Grp.,*

8

*Inc. v. Hankins*, 111 S.W.3d 69, 72 (Tex. 2003) (quoting *Yzaguirre*, 53 S.W.3d at 374). This same protection is not needed in a lease requiring royalties based on a market value. *Id.*

A central inquiry in determining whether the duty has been breached is whether the transaction was a fraud or a sham, particularly where the allegation is based on an inter-affiliate sale. *Id.* at 74. This list is not exhaustive and the implied duty may extend beyond allegations of fraud or a sham, however. *See Occidental Permian Ltd. v. Helen Jones Found.*, 333 S.W.3d 392, 401 (Tex. App. 2011). The ultimate purpose of the duty is "to protect a lessor from the lessee's self-dealing or negligence." *Yzaguirre*, 53 S.W.3d at 374. However, at no point does the implied duty convert the proceeds clause into a market value clause as "[u]nder some circumstances, a reasonable marketer may sell gas for more or less than market value." *Hankins*, 111 S.W.3d at 74.

*Canfield*, 2017 WL 1078184, at *24.

In *Flanagan v. Chesapeake Exploration,* the district court stated that the duty to reasonably market "is two-pronged: (1) 'the lessee must market the production with due diligence,' and (2) must 'obtain the best price reasonably possible.'" *Flanagan v. Chesapeake Exploration, LLC,* Civ. A. No. 3:15-CV-0222-B, 2015 WL 6736648, at *2 (N.D. Tex. Nov. 4, 2015) (quoting *Cabot Corp. v. Brown*, 754 S.W.2d 104, 106 (Tex. 1987)).

In this legal framework, the Court will now review the parties' arguments as to Counts I, II, and III which rely on the implied duty to market.

### 1. Count I

Count I of Plaintiffs' Amended Complaint addresses the implied duty to market as it relates to "[h]ydrocarbons' value." (Doc. 8 at 7.) Plaintiffs generally aver that "the prices of hydrocarbons reported by SWN in the royalty check statements and upon which the Diehls'

royalties are calculated, are not representative of the best price reasonably available or a reasonable profit." (*Id.* ¶ 37.) Defendant maintains that Count 1 of Plaintiffs' Amended Complaint must be dismissed because the "unsupported conclusory allegations" set out in support of the claim "are not enough." (Doc. 11 at 20.) In response, Plaintiffs state that "Count I focuses on SWN's sale of hydrocarbons at the interstate pipeline rather than at downstream locations" and point to the following as factual support for the claim:

> SWN sells hydrocarbons from the Units at the point where [sic] enter the interstate pipeline. [ECF Doc. 8 at ¶ 17]. The "marketing" fees that SWN charges are small compared to other post-production costs. [ECF Docs. 8 at ¶ 39; 8-8]. SWN is not a "shipper" on interstate pipelines in the vicinity of the Subject Property. [ECF Doc. 8 at ¶ 39]. As a result, SWN is unable to transport the gas downstream on interstate pipelines. [ECF Doc. 8 at ¶ 39]. Not only is SWN forced to sell hydrocarbons where they enter the interstate pipeline, but the value received by SWN has at times been less than transparent index pricing on an interstate pipeline segment in Susquehanna County. [ECF Doc. 8 at ¶ 32].

(Doc. 18 at 25.)

Plaintiffs state that "[t]hese facts plead a plausible claim that SWN failed to meet its obligation to obtain the best price reasonably possible under the implied covenant to market." (*Id.* (citation omitted).) Defendant refutes this conclusion in its reply brief, asserting that Plaintiffs' Amended Complaint lacks allegations of a better price at the correct sales location and any meaningful calculation would have to deduct from the downstream sales price all of the post-production costs, i.e., the costs incurred to get the gas from the wellhead to the actual sales point, something Plaintiffs have not done. (Doc. 14 at 14 (citing Doc. 8-1 ¶ 3).)

Rule 12(b)(6) motions invoke the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). Under Rule 8(a)(2), "a pleading must contain a 'short and plain statement of the claim showing that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 677-78. "That is to say, there must be some showing sufficient to justify moving the case beyond the pleadings to the next stage of litigation." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234-35 (3d Cir. 2008).

Defendant posits that the pleading stage standard requires "some factual averment that the purported other sales location would have resulted in a higher royalty to the lessor after all post-production costs associated with getting the gas to that purported other sales point are deducted." (Doc. 14 at 15 (citing *Flanagan*, 2015 WL 6736648; *Kilmer v. Elexco Land Services, Inc.,* 990 A.2d 1147, 1154, 1157-58 (Pa. 2010) (recognizing that while prices further downstream may be higher, costs increase as well and those post-production costs must be netted out in order to determine sale price at wellhead to ensure proper evaluation of gas value and determination)).) Defendant states that this is "the factual basis the Plaintiffs here are missing." (Doc. 14 at 15.)

Defendant's conclusion does not show it is entitled to dismissal of the claim. First, Plaintiffs aver that "[d]espite demand by the Diehls, SWN has not provided the Diehls with further information regarding the disposition of the hydrocarbons upon which their royalty is calculated." (Doc. 8 ¶ 18.) Second, Plaintiffs assert that a different sales location would have resulted in a higher royalty after all post-productions costs are deducted in that they

11

relate their claim to a diminishment in their royalties based on the lower price obtained by SWN (*see, e.g.*, Doc. 8 ¶¶ 37, 45), and their royalties, by contract, are calculated by deducting post-production costs (Doc. 8-1 ¶ 3). Third, insofar as Defendant seeks more specificity in Plaintiffs' pleading of the claim related to the calculation of post-production costs (*see, e.g.*, Doc. 11 at 22-23, Doc. 14 at 15-16), the calculation of these costs which, according to the Lease, includes "all costs of gathering, transportation, compression, fuel, [and] line loss" (Doc. 8-1 ¶ 3) is properly the subject discovery going forward.

While the Court agrees that Plaintiffs will have to make the showing identified by Defendant to prevail on their claim in Count I, the Court concludes at this early stage of the proceedings that Plaintiffs have satisfied the federal notice pleading standard required to go forward with their breach of contract under an implied duty to market theory based on the prices of hydrocarbons reported in Plaintiffs' royalty check statements. Therefore, Defendant's motion will be denied as to this claim.

## 2. Count II

Count II of Plaintiffs' Amended Complaint, pled in the alternative to Count I, addresses the implied duty to market as it relates to "[h]ydrocarbons' value" if, as alleged, SWN is selling it to its affiliate, Southwestern Energy Services Company, LLC (Doc. 8 at 7; *id.* ¶¶ 49, 54, 57.) Defendant states that "mere allegations of affiliate sales are insufficient to state a claim for a breach of an implied duty to market claim." (Doc. 11 at 23 (citing *Flanagan*, 2015 WL 6736648, at *2 ("asserting self-dealing, by itself, is insufficient to plead

a breach" of the implied duty to market); *Gottselig v. Energy Corp.*, Civ. A. No. 15-971, 2015 WL 5820771, at *6-7 (W.D. Pa. Oct. 5, 2015) (no obligation on the part of the lessee to inform the lessor of the relationship between the lessee and its marketing affiliate)).)

Here Plaintiffs make "more than a mere allegation of affiliate sales" in that their allegations include the following:

> 57.  It is averred that if SWN is "selling" the gas produced from the Walker Diehl #1H Well and the Walker Diehl #5H Well to Southwestern Energy Services Company, LLC, that said activity is not demonstrative of a diligent effort to market hydrocarbons and to secure the best price reasonably available, or a reasonable profit, by SWN because it is a non-transparent, non-arms'-length sale to an affiliate and no effort is made by SWN to secure better pricing from other buyers.

> 58. It is averred that the prices of hydrocarbons reported by SWN in the royalty check statements and upon which the Diehls' royalties are calculated, are not representative of the best price reasonably available or a reasonable profit.

> 59. It is averred that if SWN is selling to its affiliate, the price received by SWN does not represent a fair market price, but instead a price determined by related, affiliated or non-arms'-length parties and is not a diligent effort to secure the best price reasonably available or a reasonable profit.

(Doc. 8 ¶¶ 57-59.)  In their opposition brief, Plaintiffs summarize their claim as follows:

> a decision to sell hydrocarbons only to an affiliate at a location before hydrocarbons reach the interstate pipeline and not to explore downstream markets, an array of possible buyers and potentially better pricing environments is not demonstrative of an exercise of business judgment in good faith by a reasonably prudent operator to obtain the best price reasonably available.

(Doc. 13 at 21 (citing *Chambers*, 359 F. Supp. 3d at 279).)

As set out above, *Chambers* quoted *Anderson* approvingly, recognizing that "'courts facing situations in which a lessee sells hydrocarbons in non-arm's length transactions typically conclude that the lessee did not behave as a reasonably prudent operator unless it sold the hydrocarbons for the highest obtainable price.'" *See supra* p. 6; *Chambers*, 359 F. Supp. 3d at 279 (quoting *Anderson*, 312 F.R.D. at 653).

Defendant asserts that "to the extent the implied duty to market has any application here with respect to affiliate transactions . . . , it is limited only to situations involving sham transactions that justify veil piercing." (Doc. 14 at 18 (citing *Texas Oil & Gas Corp. v. Hagen*, 683 S.W.2d 24, 28 (Tex. App. 1984) (holding that royalty in a market-value lease should be measured by a downstream point of sale only when lessee's corporate veil was pierced in sham transactions with wholly-owned subsidiary)).) Contrary to Defendant's assertion, relevant authority does not limit the implied duty in the context of an affiliate sale to "sham" transactions. As set out above, the inquiry into whether a transaction between affiliates was a fraud or a sham is not the only manner in which the breach of the implied duty to market can occur in an affiliate sale situation: the implied duty may extend beyond allegations of fraud or a sham, and the ultimate purpose of the duty is to protect a lessor from the lessee's self-dealing or negligence. *See supra* p. 7; *Canfield*, 2017 WL 1078184, at *24 (internal quotations and citations omitted). Thus, Defendant's argument does not show that Plaintiffs have failed to state a plausible claim in Count II of their Amended Complaint, and the Court will deny their motion as to this count.

### 3. Count III

In Count III, Plaintiffs assert that Defendant breached its duty to market, maintaining that "[t]he implied covenant to market hydrocarbons also obligates an operator to act prudently to reduce the costs associated with moving products to market, as part of the obligation to maximize the value of the hydrocarbons" and the costs associated with their wells "are unreasonably high when compared to the value SWN receives for the 'sale' of the hydrocarbons upon which the Diehls' royalty is calculated, which is a breach of SWN's implied duty to keep such costs low." (Doc. 8 ¶¶ 67-68.) Defendant contends that Count III lacks factual allegations and fails as a matter of law. (Doc. 11 at 24.) The Court disagrees.

Plaintiffs assert that the post-production costs that are charged against their royalty "do not provide value . . . that is commensurate with the costs that are charged" because they "are charged substantial post-production costs but do not see any resultant benefit because [they] have been paid less than the index price at the marketplace where the gas is delivered, [while] having been charged for the costs of getting the gas to that location." (Doc. 8 ¶¶ 71-72.) Clearly, Count III is related to the allegations in Counts I and II that Defendant has breached the implied duty to market because it has not marketed the gas from Plaintiffs' wells to secure the best price reasonably available." (*Id.* ¶¶ 37, 52.) Thus, as another aspect of the duty to market, the Court does not find that Plaintiffs' have failed to state a claim upon which relief can be granted.

## 4. Allegations of Bad Faith

Defendant separately argues that Counts I, II, and III fail because they do not allege that SPC acted in bad faith. (Doc. 11 at 25-26.) Plaintiffs respond that they plead in their Amended Complaint that "SWN failed 'to act in good faith with requisite diligence' in marketing the hydrocarbons and that SWN failed to develop the hydrocarbons 'in a reasonable and good faith manner.'" (Doc. 13 at 22-23 (citing Doc. 8 ¶¶ 43, 60, 87).) The Court has confirmed these citations and finds that allegations stating Defendant did not act in a good faith manner are equivalent to asserting Defendant acted in bad faith. Insofar as "the essence of the duty to market is that the lessee must exercise its business judgment in good faith, acting as a reasonably prudent operator would," *Chambers*, 359 F. Supp. 3d at 279; *Canfield*, 2017 WL 1078184, at *24, the Court finds that Plaintiffs' pleading includes the relevant allegation. Further, the Court agrees with Plaintiffs that the determination of whether a defendant exercised business judgment in good faith regarding the implied duty to market is a factually intensive inquiry which is not appropriately decided at this stage of the litigation. (*See* Doc. 13 at 23.)

In making the foregoing findings, the Court concurs with Judge Caputo's observation in *Chambers* that because "oil and gas leases are laden with terms of art" and a judge's "linguistic filed of expertise may not overlap with the parties," deciding issues related to gas leases is often best undertaken on summary judgment. 359 F. Supp. 3d at 281. Here Judge Caputo's words reinforce the Court's conclusion that the terms of art in play and the

guidance provided by relevant authority indicate that summary judgment is the better vehicle to decide the issues raised in Counts I, II, and III regarding the implied duty to market.

## B. Implied Covenant to Develop

Defendant asserts that Plaintiffs' implied duty to develop claim in Count IV of the Amended Complaint fails because the Lease's terms preclude the application of the duty and Plaintiffs have not alleged that Defendant was not acting in good faith in its development of the property.  (Doc. 11 at 15, 17.)  Plaintiffs respond that they have pled a viable claim for breach of the implied duty to develop hydrocarbons: 1) they explicitly contracted that "[a]ll express or implied covenants of this lease shall be subject to Federal and state laws, executive orders, rules and regulations" (Doc. 13 at 12 (citing Doc. 8-1 ¶ 14)); 2) the well-pleaded facts in the Amended Complaint show that "the Lease is in its secondary term and there is no gas storage and no savings clause has been implicated, so any purported 'payments' to the lessor are solely based on hydrocarbon production [which] does not negate the implied covenant to develop" (Doc. 13 at 15-16 (citation omitted)); 3) the authority upon which Defendant relies is distinguishable (Doc. 13 at 15-16); and 4) they allege that Defendant failed to develop the hydrocarbons "in a reasonable and good faith manner" and this is a factual question that cannot be summarily decided (*id.* at 22-24).  The Court concludes Plaintiffs have not pled a plausible claim for relief pursuant to the implied duty to develop.

As a federal court sitting in diversity, this Court is required to apply the substantive law of the state whose law governs the action. *Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 78, (1938). The parties agree that Pennsylvania law governs this dispute.

In *Spence v. ESAB Grp., Inc.,* 623 F.3d 212 (3d Cir. 2010), the Court of Appeals for the Third Circuit explained how a federal court should determine the governing state law:

> When ascertaining Pennsylvania law, the decisions of the Pennsylvania Supreme Court are the authoritative source. *State Farm Mut. Auto. Ins. Co. v. Coviello,* 233 F.3d 710, 713 (3d Cir.2000). In the absence of a controlling decision by the Pennsylvania Supreme Court, we must predict how it would rule if faced with the issue. *Covington v. Cont'l Gen. Tire, Inc.,* 381 F.3d 216, 218 (3d Cir.2004). In making such a prediction, "we must look to decisions of state intermediate appellate courts, of federal courts interpreting that state's law, and of other state supreme courts that have addressed the issue," as well as to "analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Norfolk S. Ry. Co.,* 512 F.3d at 92 (internal quotation marks omitted). We must be mindful that "our duty is to apply state law ... irrespective of what we may regard as its merits," *Krauss v. Greenbarg,* 137 F.2d 569, 571 (3d Cir.1943); we may not impose our own view of what state law should be, *McKenna v. Pac. Rail Serv.,* 32 F.3d 820, 825 (3d Cir.1994), nor "expand state law in ways not foreshadowed by state precedent." *City of Philadelphia v. Beretta U.S.A. Corp.,* 277 F.3d 415, 421 (3d Cir.2002).

*Spence*, 623 F.3d at 216–17. Regarding the decisions of lower state courts, a federal court is to give such decisions "due regard, but not conclusive effect." *See Nationwide Mut. Ins. Co. v. Buffetta*, 230 F.3d 634, 637 (3d Cir. 2000) (citing *Burke v. Maassen,* 904 F.2d 178, 182 (3d Cir.1990)). *Buffetta* added that "[t]he opinions of intermediate appellate state courts are 'not to be disregarded by a federal court unless it is convinced by other persuasive data

that the highest court of the state would decide otherwise.'" 230 F.3d at 637 (quoting *West v. American Telephone & Telegraph Co.,* 311 U.S. 223, 237 (1940).

In *Jacobs v. CNG Transmission Corp.,* 772 A.2d 445 (Pa. 2001), the Supreme Court of Pennsylvania addressed a petition for certification from the Court of Appeals for the Third Circuit questioning "whether Pennsylvania jurisprudence recognizes an implied covenant to develop and produce oil or natural gas that would impose upon a lessee the obligation to produce oil and gas from property leased for that purpose." *Id.* at 452. *Jacobs* held that

> [a]n implied covenant to develop the underground resources appropriately exists where the only compensation to the landowner contemplated in the lease is royalty payments resulting from the extraction of that underground resource. Where, however, the parties have expressly agreed that the landowner shall be compensated if the lessee does not actively extract the resource, then the lessee has no implied obligation to engage in extraction activities. Thus, so long as the lessee continues to pay the landowner for the opportunity to develop and produce oil or gas, the lessee need not actually drill wells. At the point where that compensation ceases due to the expiration of the term of the lease, or pursuant the terms of the lease itself, the lessee then has an affirmative obligation either to develop and produce the oil or gas or terminate the landowner's contractual obligations. As this Court stated in *McKnight v. Manufacturers' Natural Gas Co.,* 146 Pa. 185, 204, 23 A. 164, 166 (1892): "The defendant cannot hold the premises and refuse to operate them."

772 A.2d at 455. Regarding agreed upon compensation in the absence of active extraction, the Court noted that "[w]hat constitutes adequate compensation for this purpose obviously must be determined by taking into consideration the facts and circumstances of each individual case." *Id.* at 455 n.5. At the end of its decision, the Court stated the following:

> This Court . . . offers no opinion as to whether the agreement of the parties in this case forecloses implication of a covenant to reasonably develop the leasehold, as that is one of the ultimate questions facing the Third Circuit. We

merely respond to the question under review by noting in the affirmative that Pennsylvania law recognizes an implied covenant but also recognizes that the specific agreement of the parties may preclude the application of the doctrine.

772 A.2d at 455.

Relying on *Jacobs*, Defendant argues that here the application of the duty to develop is precluded by the agreement of the parties because the Lease provides for compensation in the absence of production on the leased premises.  (Doc. 11 at 15.)  Specifically, Defendant points to the following methods of compensation in support of its assertion that the implied duty does not apply: "the Lease [is] to remain in force as long as oil or gas is 'produced in paying quantities', including by actual production from acreage pooled into a unit; by annual shut-in payments; by operations either on the Property or a unit; and by storing gas."  (*Id.*)

As noted above, Plaintiff argues that the alternative methods of compensation identified in the lease do not moot the implied duty to develop because "the Lease is in its secondary term and there is no gas storage and no savings clause has been implicated, so any purported 'payments' to the lessor are solely based on hydrocarbon production.  That does not negate the implied covenant to develop."  (Doc. 13 at 15 (citing *Jacobs*, 772 A.2d at 455).)

The Court concludes that the fact that the Lease is in its secondary term and is being held by production presents considerations distinct from those explicitly addressed by *Jacobs*.  However, post-*Jacobs* Pennsylvania Superior Court decisions have considered

situations where the lease at issue is held by production under the terms of the habendum clause of the lease. The Court will now look to the Superior Court's analysis of the implied duty to develop in situations where the production phase of the lease has commenced.

In *Caldwell v. Kriebel Resources Co.*, 72 A.3d 611, 613 (Pa. Super. Ct. 2013), the Superior Court considered the issue in the context of the plaintiffs' appeal of the lower court's order sustaining the defendants' preliminary objections. The plaintiffs asserted that the defendant was in breach of the implied duty to develop where it had conducted drilling activities on the leased premises but had not initiated drilling activities in the Marcellus Shale formation. 72 A.3d at 613. The lease in *Caldwell* provided for an initial 24–month term that would be extended so long as oil or gas was being produced, and the parties did not dispute that gas was being produced. *Id.* The lease also provided that "[n]o inference or covenant shall be implied as to either party hereto since the full contractual obligations and covenants of each party [are] herein fully and expressly set forth." *Id.* at 615. In support of their appeal, the plaintiffs asserted that the defendants failed to either pay delay rentals or to produce natural gas from the Marcellus Shale strata. *Id.* at 613.

In analyzing the implied duty to develop issue, *Caldwell* first set out the *Jacobs* holding identified above. 72 A.3d at 614-15. After quoting the Pennsylvania Supreme Court's statement in *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385 (Pa. 1986), that "'[n]o inference or covenant shall be implied as to either party hereto since the full contractual obligations and covenants of each party [are] herein fully and expressly set forth,'" 72 A.3d

at 615 (quoting *Hutchison*, 519 A.2d at 388; citing *Jacobs*, 772 A.2dd at 455 ("Pennsylvania law recognizes an implied covenant but also recognizes that the specific agreement of the parties may preclude the application of the doctrine.")), *Caldwell* concluded that,

> under Pennsylvania law, we are not authorized to impose an implied duty on the lessee to develop the various strata in light of the language contained in their contract. This is so, particularly in light of the fact that the Defendants are producing gas pursuant to the Agreement, a fact that Appellants acknowledge. Appellants also overlook the guarantee that they would receive delay rentals if no gas were produced. . . . Appellants have failed to persuade this Court that in Pennsylvania a lessee, as a party to an oil and gas lease, is required to drill additional wells to different depths to completely develop the entire property.

72 A.3d at 615.

In *Norm's Ltd. v. Atlas Noble, LLC*, No. 1377 WDA 2014, 2015 WL 7112968 (Pa. Super. Ct. May 8, 2015), a non-precedential decision,[5] the Pennsylvania's Superior Court considered whether the trial court erroneously granted summary judgment to the defendant as to the plaintiff's breach of the implied covenant to develop. *Id.* at *2. The lease provided in relevant part that the plaintiff would receive a 1/8th royalty for any oil or gas extracted from the leased premises; the initial term of the lease was 18 months and would continue indefinitely as long as "oil or gas or their constituents are produced or are capable of being produced on the premises in paying quantities, in the judgment of [Atlas], or as the premises shall be operated by [Atlas] in the search for oil or gas"; and the lease provided that it would

---

[5] Despite Plaintiffs' assertion that *Norm's* is a non-precedential decision and of no authoritative value (Doc. 13 at 15 & n.1), this Court is free to consider the decision as a non-precedential Superior Court opinion.

terminate within three months if Atlas did not commence a well on the premises, unless

Atlas tendered a "delay rental of $1,180.00 [ ] each year, payments to be made quarterly

until the commencement of a well." *Id.* at *1.

Like *Caldwell*, *Norm's* began the analysis of the implied duty to develop issue by

identifying the *Jacobs'* holding set out above. 2015 WL 7112968, at *5. The court then

reasoned that

> [i]n this case, the terms of the Lease preclude the imposition of an implied
> covenant to develop under *Jacobs.* The Lease provides two compensation
> schemes for Norm's depending on Atlas' drilling activity. Norm's is entitled to a
> royalty payment if Atlas extracts oil or gas from the leased premises.
> Alternatively, if Atlas is not actively extracting oil or gas, Atlas still must
> compensate Norm's in the form of a quarterly "delay rental" payment. The
> language of the Lease provides that it continues "indefinitely" as long as Atlas
> is making one of those payments. Accordingly, we will not impose an implied
> duty to develop on Atlas because it is precluded by the terms of the Lease,
> which provide that Norm's would be compensated a "delay rental" fee if Atlas
> was not extracting oil or gas. *See id.*

> Additionally, Norm's acknowledges that Atlas was actively operating a
> well on the consolidated [unit] and was paying Norm's royalties for the
> extraction of oil or gas from that well. Under the terms of the Lease, this well is
> deemed to be located upon the leased premises. . . . By the terms of the Lease,
> one well on any portion of the 99 acres, providing Norm's royalties, is sufficient
> to allow the Lease to continue indefinitely. We will not impose a covenant to
> develop that differs from the express terms of the Lease. *See Jacobs,*
> *supra.* To the extent that Norm's is arguing Atlas has a duty to completely
> develop and extract all exploitable resources on the leased premises, there is
> no provision of the Lease that imposes such a duty and we will not imply it for
> the above reasons. *See Caldwell v. Kriebel Res. Co., LLC,* 72 A.3d 611, 615
> (Pa.Super.2013) (declining to "impose an implied duty on the lessee to develop
> [all economically exploitable] strata [of natural gas] in light of the language
> contained in their contract[, and] particularly in light of the fact that the [lessee
> is] producing gas pursuant to the [a]greement[.] [Lessee] would also
> receive delay rentals if no gas were produced[ ]"), *appeal denied,* 81 A.3d 74

(Pa.2013). Therefore, Norm's cannot recover for Atlas' alleged breach of an implied duty to develop because the Lease's specific language precludes the imposition of such a duty.

2015 WL 7112968, at *5.

In *Seneca Resources Corp. v. S&T Bank*, 122 A.2d 374 (Pa. Super. Ct. 2015), the lessee filed suit against the lessor for a declaration that it had not breached the oil and gas lease between them but that lessors had breached. *Id.* at 376. The lessor appealed the lower court's order granting summary judgment for the lessee. *Id.* The lease at issue

> allowed the lessee to produce, store, withdraw, or transmit oil and gas from the 'leased premises,' which constituted approximately 25,000 acres . . . . The Lease had a primary term of 40 years, with a secondary term to continue as long as oil or gas was stored, produced or withdrawn from any portion of the leased premises. At the inception of the Lease, approximately 10,000 acres of the leased premises were undeveloped (unoperated), and 15,000 acres were developed (operated). The Lease stated that the lessee would pay royalties on any oil or gas produced from the operated acreage on the leased premises. The Lease outlined a 'lump sum or rental payment' schedule for the unoperated acreage.

122 A.3d at 377. In considering the appellants' claim that the trial court erred in refusing to apply Pennsylvania's doctrine of implied covenant to fully develop an oil and gas lease for the 3,131 acres of land which was unoperated at the time, the court provided the following context:

> the Appellants assert that the implied covenant to develop imposes an obligation on the lessee to develop the entire leased premises, and to hold otherwise would allow lessees to hold a vast amount of undeveloped land in perpetuity. The Appellants claim that Seneca is obligated to demonstrate that it acted with reasonable diligence to develop the land, and by failing to do so, must explain and excuse the lack of activity. The Appellants point out that Seneca has only drilled wells in the operated acres of the Lease, and has failed

> to develop the 3,131 acres of unoperated land, despite the land being
> commercially viable. The Appellants argue that because the unoperated
> acreage was commercially viable, and Seneca has failed to explain its failure
> to develop the land, the implied covenant to develop has been breached and
> the Appellants are entitled to enter into a new oil and gas production agreement
> with another party.

*Id.* at 384 (internal citations to the record omitted).

As in *Caldwell* and *Norm's*, the Superior Court began its analysis with *Jacobs*, noting that *Jacobs* stated the "'basis for the implied covenant … is a recognition that the lessor has entered into a bargain expecting to be compensated for the lease of the land, and principles of fairness dictate that the lessee be obligated to make diligent efforts to ensure that the lessor receives the benefit of his bargain.'" 122 A.3d at 385 (quoting *Jacobs*, 772 A.2d at 454). *Seneca* further noted that "while the implied covenant to develop doctrine exists, 'the specific agreement of the parties may preclude the application of the doctrine,'" *id.* at 395-96 (quoting *Jacobs,*772 A.2d at 455) (citing *Hutchison*, 385 A.2d at 388), and, by way of illustration pointed to the *Jacobs* holding that where "the parties have expressly agreed that the landowner shall be compensated if the lessee does not actively extract the resource, then the lessee has no implied obligation to engage in extraction activities,'" *id.* at 386 (quoting *Jacobs,* 772 A.2d at 455).

In applying the foregoing principles to the facts of the case, the Superior Court reasoned as follows:

> It is undisputed that the Appellants and Seneca were operating under the
> habendum clause of the Lease, which provides that the Lease would be
> extended, beyond the primary term of 40 years, if "oil or gas or either of them

is stored in, produced or withdrawn from all or **any portion of said leased premises**[.]" Lease, 4/17/62, at 2 (emphasis added). As noted above, the leased premises was comprised of approximately 25,000 acres, including the 3,131 acres at issue here, and did not constitute separate operated and unoperated acreages. *Id.* at 1. It is undisputed that Seneca continues to drill and withdraw gas from a portion of the leased premises.

Thus, as the parties have stipulated that the drilling and operating requirements under the Lease are satisfied, the Lease will extend for an indefinite secondary term as long as any portion of the leased premises are being drilled or operated for the production of oil or gas. *See Hutchison*, 519 A.2d at 388 (stating that the law does not imply a different contract than that which the parties have expressly adopted). Indeed, as noted in the above discussion regarding severability, the Lease makes no mention of any duty or mandate to drill or operate the unoperated acreage for the production of gas to continue the Lease as to that acreage in full force and effect. *See Jacobs,* 772 A.2d at 453. Based upon the foregoing, we conclude that the Lease between the Appellants and Seneca forecloses a finding of a breach of the implied covenant to develop and produce oil and gas on the unoperated acreage. *See Caldwell v. Kriebel Res. Co., LLC,* 72 A.3d 611, 615 (Pa.Super.2013) (concluding that the implied duty to develop various strata was inapplicable where the parties were operating under the habendum clause of their agreement, which provided that the agreement would be extended "so long as oil or gas was being produced," and the drilling activities to date had involved only shallow gas drilling); *see also Exco Resources (PA), LLC,* 2014 WL 585884, at *7–8 (holding that implied covenant to develop acreage outside that drained by the current wells, and the entire premises below 3,500 feet, did not apply where the parties' agreement extended for an indefinite secondary term so long as, *inter alia,* the premises are being drilled or operated for the production of oil or gas).

122 A.2d at 387-88 (emphasis added in *Seneca*).

The review of Pennsylvania Superior Court decisions indicates that the Superior Court has consistently concluded that an implied duty to develop was not applicable or was not breached when the lessor was not holding the property without developing it—where development had commenced it was the express terms of the lease that controlled. This

was true when the lease contained a provision like that in Plaintiffs' lease regarding implied covenants.  *See Seneca*, 122 A.3d at 385 n.11.  Notably, the plaintiffs in *Norm's* and *Caldwell* appealed the Superior Court's decisions to the Pennsylvania Supreme Court and the Court denied review.  *Norm's*, 129 A.3d 1243 (Pa. 2015) (noting reconsideration denied February 5, 2016, *id.* at n.44; *Caldwell*, 81 A.3d 74 (Pa. 2013).

In Count IV, Plaintiffs make the following assertions:

85. By only producing hydrocarbons from the Marcellus formation from one (1) well in each of the units that includes the Subject Property for the past several years without drilling and producing other wells, SWN has breached its implied covenant to reasonably develop hydrocarbons from those drilling units and the Subject Property which is included therein for the purpose of producing oil and gas.

86. It is reasonably believed and therefore averred that the single Marcellus well in each of the Walker Diehl North Gas Unit and the Walker Diehl South Gas Units do not reasonably develop, produce or drain the entirety of the Marcellus formation in those units.

87. SWN has had ample time to drill any additional wells to fully develop the Marcellus formation in each of the Walker Diehl North Gas Unit and the Walker Diehl South Gas Units in a reasonable and good faith manner and has failed to do so.

88. As a result of SWN's failure to reasonably develop and produce hydrocarbons from the units in which the Subject Property is included by drilling additional wells in the Marcellus formation the drilling units that include the Subject Property, the Diehls' production royalty has been unlawfully reduced and diluted, which has damaged them and is a breach of SWN's implied covenant to develop hydrocarbons.

(Doc. 8 ¶¶ 85-88.)  As set out in the margin above, *see supra* p.2 n.1, the habendum clause in the Lease provides as follows:

> This lease shall remain in force for a term of fine (5) years from this date (called "primary term") and as long thereafter as oil or gas is produced, or considered produced under the terms of the lease, in paying quantities from the premises or from lands pooled therewith or the premises are used for storage purposes as provided in paragraph 6 hereof, or this lease is maintained in force under any subsequent provisions hereof.

(Doc. 8-1 ¶ 2.)

Defendant analogizes the situation here to those considered by the Superior Court, asserting that the Lease does not require production from every acre to remain in force after the primary term and alternative methods of compensation are set out in the Lease. (Doc. 11 at 16.) Defendant therefore concludes that it is entitled to dismissal of Count IV under Pennsylvania Superior Court precedent. (Doc. 11 at 16; Doc. 14 at 12.)

Plaintiffs dispute Defendant's reliance on the cited authority and attempt to distinguish each of the cases upon which Defendant relies. (Doc. 13 at 16.) Plaintiffs assert that the lessor in *Caldwell* argued that the lessee had to develop every strata of gas to satisfy the implied duty to develop, a broad claim which Plaintiffs do not make. (Doc. 13 at 16.) Plaintiffs distinguish *Seneca* on the basis that the lease explicitly provided for delay rentals to hold unoperated acreage and that unoperated acreage could be converted to operated acreage at any time thus they expressly bargained for payments in lieu or rentals which the parties here did not. (Doc. 13 at 15.) Plaintiffs distinguish *Norm's* on the basis that the court found that the delay rental could be paid indefinitely which is not the case here. (Doc. 13 at 16.)

While Plaintiffs have pointed to differences in the cases reviewed, they have not cited to contrary authority. (See Doc. 13 at 11-16.) Moreover, the distinctions identified fail to legally distinguish the cases in that the decisions in favor of the lessees in *Caldwell*, *Norm's,* and *Seneca* were based on the fact that the leases provided payment alternatives in lieu of development and, once production had commenced under the terms of the lease, the lessee were not "holding the properly without developing it, which would not be in compliance with the dictates of *Jacobs.*" *Caldwell*, 72 A.3d at 616. In other words, during the production phase of operations, absent express development terms in the lease, the terms of the habendum clause represent the only bargain of the parties and no implied duty to develop reasonably can be imposed upon the lessee thereafter. As stated in *Aye v. Philadelphia Co.*, 44 A. 555, "where the parties have agreed on what shall be done, there is no room for the implication of anything not so stipulated for." *Id.* at 456.

Here the lease does not contain express terms related to the number of wells to be drilled or other specific aspects of development, but the parties agreed upon "what shall be done" in terms of the development needed to hold the lease.in the habendum clause. As to production, one well can satisfy the habendum clause provision that the Lease will remain in force based on the production of oil or gas in paying quantities. (Doc. 8-1 ¶ 2.) Because Defendant is producing gas from two wells, it is not holding the property without developing it under *Jacobs* and the Superior Court cases. As in the Superior Court cases, Plaintiffs were entitled to alternative compensation in the event that drilling did not commence,

including delay rental payments.  (*See* Doc. 8-1 ¶ 13.)  Though Plaintiffs were not receiving

any alternate payments because the production phase had begun, that fact does not

distinguish this case in that alternate payments were not being made for unused portions of

land at the time the Superior Court decided *Caldwell*, *Norm's*, and *Seneca*—it was the fact

that the leases had provided for alternative compensation before, or in lieu of, development

that mattered.  In *Jacobs'* terms, Defendant is not "hold[ing] the premises and refus[ing] to

operate them."  772 A.2d at 455.  Thus, based on Pennsylvania Superior Court precedent

grounded in the Pennsylvania Supreme Court's decision in *Jacobs*, the Court concludes

that Plaintiffs have not stated a plausible claim for relief in Count IV that the implied duty to

develop requires further natural gas development of their property by Defendant.[6]

Insofar as the distinctions between the circumstances presented here and those at

issue in *Caldwell*, *Norm's*, and *Seneca* could be considered indicative of a different result

such that an implied duty to develop may apply in this case, the Court will address

Defendant's alternative argument that Plaintiffs have not alleged that Defendant was not

---

[6] Any claim that Defendant is violating an *express* provision of the lease is a separate claim. Although Plaintiffs assert in Count V that they are entitled to a declaration that the habendum clause has not been satisfied and the Lease has terminated because hydrocarbons have not been produced in paying quantities (Doc. 8 ¶¶ 91-101), they do not associate their contention with their assertion of an implied duty to develop in Count IV.  (*See* Doc. 8 ¶¶ 77-90; Doc. 13 at 10-16.)  The allegations contained in Count V do not warrant a different conclusion as to Count IV in that if it were to be determined that gas is not being produced in paying quantities from the two wells which are producing gas, it would follow that the lease would not be held by production, and, in the absence of an alternative method of holding the lease, the implied duty to develop would not arise because the lease would be terminated.  Insofar as the parties' arguments regarding production in paying quantities are made in the margin (both parties relying on *T.W. Phillips Gas and Oil Co. v. Jedlicka*, 42 A.3d 261, 267 (Pa. 2012)) (*see* Doc. 11 at 16 n.4; Doc. 13 at 24 n.3; Doc. 14 at 6 n.1), the issue is not deemed to be properly presented for the Court's consideration.

acting in good faith on its business judgment relative to the property.[7]  (Doc. 11 at 17 (citing

*Young v. Forest Oil Co.*, 45 A. 121 (Pa. 1899); *Colgan v. Forest Oil Co.*, 45 A. 119 (Pa.

1899); *Adams v. Stage*, 18 Pa. Super. 308 (Pa. Super. 1901)).)  On this point, Defendant

maintains that "whether additional wells should be drilled and, if so, when and where is left

to the business judgment of the lessee" and the lessor "must show that the lessee was not

acting in good faith on his business judgment."  (Doc. 11 at 14 (internal quotation omitted)

(citing *Adams*, 18 Pa. Super. at 311-13 (citing *Young*, 45 A. 121; *Colgan*, 45 A. 119)).)

     *Colgan v. Forest Oil Co.*, 45 A. 119 (Pa. 1899), provides perspective on court

intervention in disputes regarding oil and gas leases once production has commenced.

*Colgan* involved an action in equity where the defendant contracted to put down one well on

the plaintiff's land and had, in fact, put down five, but the plaintiff charged that the five were

put down on the eastern half of the property to the neglect of the western half.  *Id.* at 119.

The Court recognized that the lessor was seeking relief under "covenants [that] are merely

implied," *id.* at 119, but did not specifically discuss the issue in terms of an implied duty to

develop and *Jacobs* did not cite the case.  Nonetheless, in that *Colgan* remains good law,

see, e.g., *T.W. Phillips Gas and Oil Co. v. Jedlicka*, 42 A.3d 261, 270 (Pa. 2012), the Court

will consider its application to the case at bar.

---

[7] The Superior Court cases did not address the issue of the lessee's good faith development of the property in the context presented here.  *Caldwell* considered a good faith standard as to an "implied duty to develop in paying quantities," and rejected the lessors' argument. 72 A.3d at 616.

The Pennsylvania Supreme Court disagreed with the lower court that the western half of the farm would furnish at least one paying well and the lower court's decree that a well should be put down there by the lessee.  45 A. at 121.  The Court considered evidence which had been proffered by the lessor which was only that wells had been drilled on adjoining farms and the lessor's testimony that he thought he could get others to take the land.  *Id.* The Court found that this was

> far short of what is required.  So long as the lessee is acting in good faith on business judgment, he is not bound to take any other party's, but may stand on his own. Every man who invests his money and labor in a business does it on the confidence he has in being able to conduct it in his own way. No court has any power to impose a different judgment on him, however erroneous it may deem his to be. Its right to interfere does not arise until it has been shown clearly that he is not acting in good faith on his business judgment, but fraudulently, with intent to obtain a dishonest advantage over the other party to the contract. Nor is the lessee bound, in case of difference of judgment, to surrender his lease, even pro tanto, and allow the lessor to experiment. Lessees who have bound themselves by covenants to develop a tract, and have entered and produced oil, have a vested estate in the land, which cannot be taken away on any mere difference of judgment. It is not within the jurisdiction of any court to oust the owner and forfeit the title to estates in that way, and the jurisdiction of equity to decree any specific act or declare forfeiture depends on fraud averred and fully proved. Experimental drilling of other wells on the western portion of this tract may work injury to defendant's wells already down, without any corresponding advantage to the plaintiff. The weight of the evidence is that such would be the probable result, but, whether it would or not, the defendant is not bound to submit to the experiment. It has an estate in the whole tract, has fully performed its agreement in relation thereto, and not a single fact has been shown to authorize the court to interfere with its title or possession.

*Id.* at 121.

In response to Defendant's argument that Plaintiffs did not allege that Defendant was not acting in good faith on its business judgment relative to the property (Doc. 11 at 17), Plaintiffs contend that Count IV should go forward because they have alleged that Defendant "failed to develop the hydrocarbons 'in a reasonable and good faith manner'" (Doc. 13 at 22-23 (quoting Doc. 8 ¶¶ 43, 60, 87)). In Count IV of the Amended Complaint, Plaintiffs state that "SWN has had ample time to drill any additional wells to fully develop the Marcellus formation in each of the Walker Diehl North Gas Unit and the Walker Diehl South Gas Units in a reasonable and good faith manner and has failed to do so." (Doc. 8 ¶ 87.) While Plaintiffs correctly assert that whether a party acts in good faith is generally a question for a jury (Doc. 13 at 23 (citing *Pressey v. McCornack*, 84 A. 427 (Pa. 1912)), more is required to state a plausible claim for relief when the established good faith standard related to the matter at issue must be grounded "on fraud averred." *Colgan*, 45 A. at 121. Plaintiffs conclusory assertion that Defendant's failed to develop the hydrocarbons in a "reasonable and good faith manner" (Doc. 8 ¶ 87) cannot sustain a claim under *Colgan*. Because fraud is not averred in Plaintiffs' Amended Complaint, Count IV cannot go forward on Plaintiffs' claim as pled.

Though the facts alleged by Plaintiffs do not suggest fraudulent behavior, the Court cannot say for certain that granting leave to amend would be futile. Therefore, under Third Circuit precedent, the Court will allow Plaintiffs to file an amended complaint as to Count IV. *Phillips*, 515 F.3d at 245. In so doing, Plaintiffs are reminded that, under the Federal Rules

of Civil Procedure, in alleging a claim for fraud, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

## C. Counts V and VI

Defendant asserts that because Plaintiffs' implied covenant claims fail as a matter of law, their derivative Declaratory Judgment and Quiet Title Claims also fail. (Doc. 11 at 26.) Defendant specifically maintains that "Plaintiffs' declaratory judgment and quiet title claims require a finding that SPC breach an implied duty. But, the implied duty claims fail as noted above. Thus, Plaintiffs' declaratory judgment and quiet title claims fail as a matter of law." (Id. (citng *Wheeland Family Ltd. P'ship v. Rockdale Marcellus, LLC*, Civ. A. No. 2019 WL 4687665 (M.D. Pa. July 3, 2019) (granting judgment on pleadings on quiet title claims because implied covenants could not usurp lessee's express rights), *Norm's Ltd.*, 2015 Pa. Super. Unpub. (declining to address declaratory judgment claim and quiet title claim that were derivative of meritless oil and gas lease breach claim).) Plaintiffs respond that Counts V and VI are not derivative claims and Defendant does not substantively dispute them. (Doc. 13 at 24.)

Discussion of these claims is not needed in that the basis for Defendant's argument for dismissal is the presumed dismissal of the breach of covenant claims. Because Counts I, II, and III go forward, Defendant has articulated no basis upon which to dismiss Counts V and VI as is its burden at this stage of the proceedings . Therefore, Defendant's motion will be denied as to these counts.

## V. CONCLUSION

For the foregoing reasons, Defendant SWN Production Company, LLC's Motion to Dismiss the Amended Complaint (Doc. 9) will be denied in part and granted in part. The Motion will be denied as to Counts I, II, III, V, and VI. The Motion will be granted as to Count IV. Count IV will be dismissed without prejudice and Plaintiffs will be granted an opportunity to file an Amended Complaint. With this determination, the Court makes no findings on the merits or ultimate success of Plaintiffs' remaining claims. An appropriate Order will be filed simultaneously with this Memorandum Opinion.

_s/ Robert D. Mariani_____
Robert D. Mariani
United States District Judge